**Dr. Sakharam D. MAHURKAR, Plaintiff–Appellee,**

v.

**C.R. BARD, INC., Davol Inc. and Bard Access Systems, Inc., Defendants–Appellants.**

No. 95–1225.

United States Court of Appeals, Federal Circuit.

March 29, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined May 3, 1996.

Raymond P. Niro, Niro, Scavone, Haller & Niro, Chicago, Illinois, argued for plaintiff-appellee. With him on the brief were John C. Jakes, Michael P. Mazza and Davis J. Sheikh.

H. Ross Workman, Workman, Nydegger & Seeley, Salt Lake City, Utah, argued for defendants-appellants. With him on the brief were Brent P. Lorimer and David R. Wright.

Before ARCHER, Chief Judge, MICHEL, and RADER, Circuit Judges.

RADER, Circuit Judge.

Dr. Sakharam D. Mahurkar sued C.R. Bard, Inc., Davol Inc., and Bard Access Systems, Inc. (Bard) for infringing U.S. Patent No. 4,808,155 (the '155 patent). A jury found that the '155 patent is not invalid for obviousness. The jury also found that Bard infringed the '155 patent both literally and under the doctrine of equivalents. After a bench trial on damages, the district court awarded Dr. Mahurkar $4,139,194.76 in actual damages and prejudgment interest.

On appeal, the parties raised numerous issues to which this court gave full consideration. As to infringement, this court concludes substantial evidence supports the jury's findings. As to validity and damages, this court will address only two of the contentions. First, Bard appeals the trial court's grant of Dr. Mahurkar's motion for judgment as a matter of law at the close of the evidence on anticipation. Also, Bard appeals the district court's award of damages. Because the district court correctly granted Dr. Mahurkar's motion on anticipation, this court affirms in part. However, because the district court abused its discretion in awarding damages, this court vacates the award and remands for recalculation of a reasonable royalty.

## BACKGROUND

The '155 patent discloses a simple double-lumen catheter. A double-lumen catheter simultaneously removes and restores fluids to the human body during a transfusion. To accomplish this mission, this flexible surgical instrument uses two channels—one to withdraw fluids, another to inject fluids.

Dr. Mahurkar created the claimed invention to treat chronic dialysis patients whose veins usually will no longer tolerate acute catheters. Dr. Mahurkar's invention does not traumatize sensitive veins, yet still supports maximum blood flow with a minimum catheter cross section. After a chronic patient's veins have deteriorated from frequent transfusions, this catheter permits insertion into a major vein—percutaneous insertion—without expensive cut-down surgery.

Dr. Mahurkar filed an initial patent application on his invention on October 24, 1983. After two continuations, the United States Patent and Trademark Office (PTO) issued the '155 patent on February 28, 1989. Claim 1 of the '155 patent reads:

a double lumen catheter having an elongated tube with a proximal cylindrical portion enclosing first and second lumens separated by an internal divider, the proximal end of said elongated tube connecting to two separate connecting tubes communicating with the respective first and second lumens, the first lumen extending from the proximal end of said elongated tube to a first opening at the distal end of said elongated tube, and the second lumen extending from the proximal end of said elongated tube to a second opening spaced in the longitudinal direction away from said first opening, said tube having a non-conical and non-tapered distal end portion having a cross-sectional area smaller than the cross-sectional area of said proximal cylindrical portion, and said distal end portion extending from said second opening and terminating in a *blunt distal end to prevent the distal end of the catheter from traumatizing or becoming caught in the walls of a vessel into which the catheter is inserted.* (Emphasis added.)

In May 1990, Dr. Mahurkar granted Bard a limited license under the '155 patent. This license limited Bard to non-hemodialysis applications. Dr. Mahurkar asserts that Bard made and sold infringing hemodialysis catheters in violation of that license. Specifically, Dr. Mahurkar claims that Bard's "Hickman I" and "Hickman II" hemodialysis catheters infringe the '155 patent.

Bard does not contest that the Hickman I catheter infringes the '155 patent. Bard also represented to its customers that the only difference between the Hickman I and the Hickman II was a mere "visual" change. Nonetheless, Bard asserts that the Hickman II does not infringe the '155 patent. Specifically, Bard alleges that the claimed '155 catheter end, or tip, differs from the Hickman II end. Bard argues that the end of the Hickman II is "beveled" and not "blunt," as required by the claims.

Bard also argues that the '155 patent is invalid under 35 U.S.C. § 102(a) (1994). In July 1983, Cook, Inc. published a nationwide catalog (the Cook catalog) disclosing a Cook Double Lumen Subclavian Hemodialysis Catheter. At the conclusion of the evidence at trial, Bard moved for judgment as a matter of law (JMOL) that the Cook catalog anticipated the '155 patent. Dr. Mahurkar cross-moved. The district court granted Dr. Mahurkar's motion for JMOL. According to the district court, no reasonable jury could find the Cook catalog anticipated claim 1 of the '155 patent.

## DISCUSSION

### The Cook Catalog as Prior Art

The district court granted Dr. Mahurkar's motion for JMOL under Fed.R.Civ.P. 50(a)(1). Rule 50 states, in relevant part:

[I]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986) (comparing directed verdict with summary judgment).

■ On appeal, this court must independently determine compliance with the requirements of Rule 50(a). Warrington v. Elgin, J & E Ry., 901 F.2d 88, 90 (7th Cir.1990). In evaluating a Rule 50(a) motion, this court must examine the evidence to determine whether a "jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Id. at 89. In this regard, this court must view the evidence in a light most favorable to the non-moving party. Id. at 90.

■ At trial, Bard sought to show that the Cook catalog anticipated claim 1 of the '155 patent. The catalog's July 1983 publication date preceded the filing of the '155 patent by about three months. The parties disputed only the status of the Cook catalog as prior art under 35 U.S.C. § 102(a). By challenging the validity of the '155 patent, Bard bore the burden of persuasion by clear and convincing evidence on all issues relating to the status of the Cook catalog as prior art. Innovative Scuba Concepts, Inc. v. Feder Indus., Inc., 26 F.3d 1112, 1115, 31 USPQ2d 1132, 1134 (Fed.Cir.1994).

Section 102(a) of title 35 defines one class of prior art. Lamb–Weston, Inc. v. McCain Foods, Ltd., 78 F.3d 540, 544–45 (Fed.Cir. 1996). As a printed publication, the Cook catalog fits within some terms of 35 U.S.C. § 102(a). Section 102(a) also requires, however, that the catalog description appear before the invention.

■ In ex parte patent prosecution, an examiner may refer to a document published within one year before the filing date of a patent application as prior art. However, this label only applies until the inventor comes forward with evidence showing an earlier date of invention. Once the inventor shows an earlier date of invention, the document is no longer prior art under section 102(a).

■ Any suggestion that a document is prior art because it appears before the filing date of a patent ignores the requirements of section 102(a). Section 102(a) explicitly refers to invention dates, not filing dates. Thus, under section 102(a), a document is prior art only when published before the invention date. For the Cook catalog to constitute prior art, therefore, it must have been published before Dr. Mahurkar's invention date.

■ Resolution of this point turns on procedural rules regarding burdens of proof as well as several rules of law borrowed from the interference context. Bard offered into evidence at trial a document published about three months before the filing date of Dr. Mahurkar's patent disclosing each and every element of the claimed invention. Dr. Mahurkar then had the burden to offer evidence showing he invented the subject matter of his patent before the publication date of the

document. *Innovative Scuba*, 26 F.3d at 1115; *see generally Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, — U.S. —, — – —, 114 S.Ct. 2251, 2255–57, 129 L.Ed.2d 221 (1994) (discussing burden of persuasion and burden of production). Had Dr. Mahurkar not come forward with evidence of an earlier date of invention, the Cook catalog would have been anticipatory prior art under section 102(a) because Dr. Mahurkar's invention date would have been the filing date of his patent, *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562, 19 USPQ2d 1111, 1115 (Fed.Cir.1991).

However, Dr. Mahurkar offered evidence at trial to show that he invented the subject matter of the patent before publication of the Cook reference. He met his burden of production. Consequently, this court turns to an evaluation of the evidence offered by Dr. Mahurkar under the proper burden of persuasion in this infringement action and the rules of law relating to invention dates.

■ Section 102(g) of title 35 contains the basic rule for determining priority. 35 U.S.C. § 102(g) (1994). Section 102(g) also provides basic protection for the inventive process, shielding in particular the creative steps of conception and reduction to practice. In the United States, the person who first reduces an invention to practice is "prima facie the first and true inventor." *Christie v. Seybold*, 55 F. 69, 76 (6th Cir.1893) (Taft, J.). However, the person "who first conceives, and, in a mental sense, first invents . . . may date his patentable invention back to the time of its conception, if he connects the conception with its reduction to practice by reasonable diligence on his part, so that they are substantially one continuous act." *Id.* Stated otherwise, priority of invention "goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Price v. Symsek*, 988 F.2d 1187, 1190, 26 USPQ2d 1031, 1033 (Fed.Cir.1993).

■ To have conceived of an invention, an inventor must have formed in his or her mind "a definite and permanent idea of the complete and operative invention, as it is hereaf-

ter to be applied in practice." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228, 32 USPQ2d 1915, 1919 (Fed.Cir. 1994), *cert. denied*, — U.S. —, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996) (citations omitted). The idea must be "so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Id.*

■ This court has developed a rule requiring corroboration where a party seeks to show conception through the oral testimony of an inventor. *Price*, 988 F.2d at 1195. This requirement arose out of a concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent. *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 60, 43 S.Ct. 322, 327, 67 L.Ed. 523 (1923); *accord Deering v. Winona Harvester Works*, 155 U.S. 286, 300–01, 15 S.Ct. 118, 123–24, 39 L.Ed. 153 (1894); *The Barbed Wire Patent*, 143 U.S. 275, 284–85, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776, 34 USPQ2d 1822, 1826 (Fed.Cir.1995); *New Idea Farm Equip. Corp. v. Sperry Corp.*, 916 F.2d 1561, 1567, 16 USPQ2d 1424, 1430 (Fed.Cir.1990). While perhaps prophylactic in application given the unique abilities of trial court judges and juries to assess credibility, the rule provides a bright line for both district courts and the PTO to follow in addressing the difficult issues related to invention dates.

■ In assessing corroboration of oral testimony, courts apply a rule of reason analysis. *Price*, 988 F.2d at 1195. Under a rule of reason analysis, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id.*

■ This court does not require corroboration where a party seeks to prove conception through the use of physical exhibits. *Id.* The trier of fact can conclude for itself what documents show, aided by testimony as to

what the exhibit would mean to one skilled in the art. *Id.*

Reduction to practice follows conception. To show actual reduction to practice, an inventor must demonstrate that the invention is suitable for its intended purpose. *Scott v. Finney,* 34 F.3d 1058, 1061, 32 USPQ2d 1115, 1118 (Fed.Cir.1994). Depending on the character of the invention and the problem it solves, this showing may require test results. *Id.* at 1062; *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 550, 16 USPQ2d 1587, 1592 (Fed.Cir.1990). Less complicated inventions and problems do not demand stringent testing. *Scott,* 34 F.3d at 1062. In fact, some inventions are so simple and their purpose and efficacy so obvious that their complete construction is sufficient to demonstrate workability. *Id.; King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 861, 226 USPQ 402, 407 (Fed.Cir. 1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).

Where a party is first to conceive but second to reduce to practice, that party must demonstrate reasonable diligence toward reduction to practice from a date just prior to the other party's conception to its reduction to practice. *Griffith v. Kanamaru,* 816 F.2d 624, 625–26, 2 USPQ2d 1361, 1362 (Fed.Cir.1987).

Bard bears the burden of persuasion on the status of the Cook catalog as prior art. Bard must persuade the trier of fact by clear and convincing evidence that the Cook catalog was published prior to Dr. Mahurkar's invention date.

At trial, Dr. Mahurkar offered evidence to demonstrate prior invention in two ways. He offered evidence to show he conceived and reduced to practice his invention before publication of the catalog. He also offered evidence to show that he conceived of his invention prior to the date of publication of the Cook catalog and that he proceeded with reasonable diligence from a date just prior to publication of the catalog to his filing date. Bard, in turn, challenged Dr. Mahurkar's evidence.

With all of the evidence from both sides before the jury, Bard must persuade the jury by clear and convincing evidence that its version of the facts is true. In other words, Bard must persuade the jury that Dr. Mahurkar did not invent prior to publication of the catalog. This is because (1) he did not conceive and reduce his invention to practice before the publication date and (2) he did not conceive and thereafter proceed with reasonable diligence as required to his filing date. If Bard fails to meet this burden, the catalog is not prior art under section 102(a).

Viewing the evidence of record below in the light most favorable to Bard, this court concludes that no reasonable jury could have found clear and convincing evidence that the Cook catalog was prior art. Dr. Mahurkar testified that he conceived and began work on dual-lumen, flexible, hemodialysis catheters, including the '155 catheter, in 1979. From late 1980 through early 1981, Dr. Mahurkar constructed polyethylene prototype catheters in his kitchen. He bought tubing and various machines for making and testing his catheters.

During this time period, he also tested polyethylene prototypes and used them in flow and pressure drop tests in his kitchen. These tests used glycerine to simulate blood. These tests showed, to the limit of their design, the utility of his claimed invention. Dr. Mahurkar designed these tests to show the efficiency of his structure knowing that polyethylene catheters were too brittle for actual use with humans. But, he also knew that his invention would become suitable for its intended purpose by simple substitution of a soft, biocompatible material. Dr. Mahurkar adequately showed reduction to practice of his less complicated invention with tests which "[did] not duplicate all of the conditions of actual use." *Gordon v. Hubbard,* 347 F.2d 1001, 1006, 146 USPQ 303, 307 (CCPA 1965).

Dr. Mahurkar provided corroboration for his testimony. Dr. Mahurkar confidentially disclosed the catheter prototype tips of his '155 invention to Geoffrey Martin, President of Vas–Cath Inc. in 1981, and Brian L. Bates of Cook, Inc. Mr. Martin testified that he received the polyethylene prototype tips from Dr. Mahurkar in 1981. Dr. Mahurkar

also produced a letter from Stephen Brushey, an employee of Vas–Cath, dated April 21, 1981, that described several of his catheters. Additionally, Dr. Mahurkar presented a letter from Brian L. Bates of Cook, Inc., dated October 23, 1981. In this letter, Cook was "impressed with the thought and technology which has gone into the fabrication of the prototype material."

In addition to evidence of actual reduction to practice before publication of the Cook catalog, Dr. Mahurkar also showed reasonable diligence from his conception date through the filing of his patent application. From conception to filing, Dr. Mahurkar continuously sought to locate companies capable of extruding his tubing with the soft, flexible materials necessary for human use.

On this record and with the applicable burden of persuasion, no reasonable jury could have found that Bard proved the Cook catalog was prior art. Consequently, the court properly granted Dr. Mahurkar's motion for JMOL of non-anticipation of claim 1 of the '155 patent.

## The Damage Award

A trial court has discretion both in selecting the methodology for and in calculating a damage award. *King Instruments Corp. v. Perego*, 65 F.3d 941, 945, 36 USPQ2d 1129, 1131 (Fed.Cir.1995). On appeal, this court reviews the amount of damages found by the trial judge for clear error and the methodology used by the trial judge for abuse of discretion. *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1543, 35 USPQ2d 1065, 1067 (Fed.Cir.) (en banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995); *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 926 F.2d 1161, 1164, 17 USPQ2d 1922, 1924 (Fed.Cir.1991).

The Patent Act redresses violations of the right to exclude with damages adequate to compensate for infringement. 35 U.S.C. § 284 (1994); *Perego*, 65 F.3d at 947. Damages may not be less than "a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits." *Rite–Hite*, 56 F.3d at 1554.

Calculation of a reasonable royalty depends on the particular facts of each case. This task is simplified when the record shows an established royalty for the patent in question or for related patents or products. Lacking evidence of royalties in the marketplace, this court accepts evidence about hypothetical results of hypothetical negotiations between the patentee and infringer (both hypothetically willing) at the time infringement began. *Fromson v. Western Litho Plate & Supp. Co.*, 853 F.2d 1568, 1574, 7 USPQ2d 1606, 1612 (Fed.Cir.1988). Relevant economic facts may inform this judicially-sanctioned speculation. *See Rite–Hite*, 56 F.3d at 1554–55 (collecting cases).

The Patent Act also provides for punitive damages in certain classes of cases, in addition to attorney fees, costs, and prejudgment interest. Under 35 U.S.C. § 284, a trial judge may enhance actual compensatory damages by up to three times. The Act makes no mention of the circumstances in which a court may increase the damages. This court, however, has stated that a trial judge may increase damages upon a finding of willful infringement. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 830–31, 23 USPQ2d 1426, 1438 (Fed.Cir.1992). Whether an infringer acted willfully is a question of fact that rests on a determination of the infringer's state of mind. *Id.* at 828. With the focus on an infringer's mental state, good faith reliance on the competent advice of counsel constitutes a defense to willfulness. *See id.* at 829.

In exceptional cases, a court may also award attorney fees to the prevailing party. 35 U.S.C. § 285 (1994). Bad faith litigation, willful infringement, or inequitable conduct are among the circumstances which may make a case exceptional. *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551–52, 13 USPQ2d 1301, 1304–05 (Fed.Cir.1989).

Finally, a court should normally award prejudgment interest to afford the plaintiff full compensation for infringement. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654–55, 103 S.Ct. 2058, 2061–62, 76 L.Ed.2d 211 (1983). In *Devex*, the Supreme

Court suggested a court may deny prejudgment interest in certain limited circumstances, for example, where "the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Id.* at 657, 103 S.Ct. at 2063.

■ The trial court fixed the total reasonable royalty rate at 34.88%. This total rate comprises a 25.88% rate with a 9% "kicker." When engaging in its judicially-sanctioned speculation as to the results of a hypothetical negotiation, the trial court appears to have considered evidence of Bard's actual net profit, the profit margin Bard would have been able to negotiate, and Bard's research and development savings. The court specifically found Bard was entitled to a 10% profit margin. It also determined that Bard realized a net profit of 29.16% on its sales of the Hickman catheters and saved 6.72% in research and development costs.

The trial court then calculated an initial royalty rate of 25.88%.[1] The district court apparently arrived at this figure by subtracting the 10% profit factor from the actual net profit of 29.16% and adding the savings of 6.72% in research and development. This award falls within the boundaries of reasonableness, and thus the trial court did not clearly err in calculating this much of the award.

■ To this reasonable royalty, however, the trial court added an additional 9%. It labeled this addition a "Panduit kicker," citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 197 USPQ 726 (6th Cir.1978). The district court reasoned:

Bard's cost for research and development were nonexistent.

That then leads to the question of the Panduit kicker.

. . . .

[T]he fact remains that the Panduit kicker and the reasons given ... for the Panduit kicker apply to this case. There is even less guidance for setting a Panduit

kicker than there is for setting a reasonable royalty. But I have looked closely at the figures, and I believe that a Panduit kicker in this case of 9 percent is appropriate. So I, therefore, set the royalty rate at 34.88 percent.

. . . .

I'm declining to address the 285 question.

With this reasoning and its 9% addition, however, the trial court abused its discretion.

In *Panduit,* the Sixth Circuit held that a patentee could recover damages if the patentee proved: (1) a demand for the patented product; (2) the absence of acceptable, noninfringing substitutes; (3) the patentee's capacity to exploit the demand; and (4) the profits lost due to infringement. 575 F.2d at 1156. This four-step test is "an acceptable, though not an exclusive" test for determining "but for" causation for lost profits. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214, 1218, 27 USPQ2d 1671, 1674 (Fed.Cir.1993); *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1577, 12 USPQ2d 1026, 1028 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). In other words, *Panduit* supplied one method of proving damages. *Panduit* is not the exclusive test for proving damages. *See, e.g., Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 552, 222 USPQ 4, 6 (Fed.Cir.1984).

Although one method for proving damages, the *Panduit* methodology does not include a "kicker" to account for litigation expenses or for any other expenses. In *Panduit,* the Sixth Circuit noted that the patentee had incurred more than $400,000 in litigation expenses battling with the infringer for over thirteen years. Suggesting that the damages awarded by the trial court seemed unfair in light of the extensive litigation, the court observed that:

The setting of a reasonable royalty after infringement cannot be treated, as it was here, as the equivalent of ordinary royalty negotiations among truly "willing" patent

---

**1.** Bard contends that the district court's royalty award did not leave Bard with adequate profit. However, courts have employed methodologies in calculating reasonable royalties in which the

royalties exceed the infringer's profit. *See, e.g., Radio Steel & Mfg. Co. v. MTD Prods., Inc.,* 788 F.2d 1554, 1557, 229 USPQ 431, 433 (Fed.Cir. 1986).

> owners and licensees. That view would constitute a pretense that the infringement never happened. It would also make an election to infringe a handy means for competitors to impose a "compulsory license" policy upon every patent owner.

*Panduit,* 575 F.2d at 1158. However, the *Panduit* court specifically stated that it "express[es] no view respecting the applicability of rules governing willful infringement, treble damages, or attorneys' fees, none of which have been made of issue here." *Id.* at 1158 n. 6.

In this case, the district court invoked *Panduit* out of context. This case did not feature a lost profits award at all, but instead reasonable royalties. To apply the *Panduit* test, the trial court would have needed to ascertain whether Bard's and Mahurkar's products competed for the same customers, whether the market included acceptable non-infringing substitutes, and whether Dr. Mahurkar had the capacity to exploit the demand. Without such evidence in this record, the trial court invoked *Panduit* out of context.

More important, *Panduit* does not authorize additional damages or a "kicker" on top of a reasonable royalty because of heavy litigation or other expenses. In sections 284 and 285, the Patent Act sets forth statutory requirements for awards of enhanced damages and attorney fees. The statute bases these awards on clear and convincing proof of willfulness and exceptionality.[2] *Panduit* at no point suggested enhancement of a compensatory damage award as a substitute for the strict requirements for these statutory provisions. The district court's "kicker," on the other hand, enhances a damages award, apparently to compensate for litigation expenses, without meeting the statutory standards for enhancement and fees. Therefore, the district court abused its discretion in awarding a 9% "Panduit kicker."

## CONCLUSION

This court affirms the district court's denial of Bard's motion for JMOL under 35 U.S.C. § 102(a) and affirms the district court's grant of Dr. Mahurkar's cross motion.

This court vacates the district court's judgment providing for a 34.88% royalty rate. This case is remanded for recalculation of a reasonable royalty.

## COSTS

Each party shall bear its own costs.

*AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED.*

[redacted]

2. In this case, the district court stated that "I believe that the 285 question is in all likelihood to be decided against Dr. Mahurkar."